IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| MEYN AMERICA, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:14-CV-41(MTT) |
| | ) | |
| TARHEEL DISTRIBUTORS, INC., and | ) | |
| JOSEPH P. ZAJAC, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

This is a diversity case in which the Plaintiff alleges violations of the Georgia

Trade Secrets Act of 1990, O.C.G.A. §§ 10-1-760 *et seq.* ("the Act" or "GTSA"), and

related claims arising out of the Defendants' acquisition of drawings the Plaintiff uses to

manufacture parts for poultry processing machines.  Defendant Joseph P. Zajac moves

to dismiss (Doc. 15) the Plaintiff's amended complaint (Doc. 14) under Fed. R. Civ. P.

12(b)(2) for lack of personal jurisdiction.  Both Defendants also argue the Plaintiff has

failed to state a claim for relief under Fed. R. Civ. P. 12(b)(6).  For the following

reasons, the motion is **GRANTED in part** and **DENIED in part**.

## I.   FACTS

### A.  The Parties

The Plaintiff is a Georgia limited liability company with its principal place of

business in Ball Ground, Georgia.  (Doc. 14, ¶ 10).  It is a wholly-owned subsidiary of

Meyn LLC, also a Georgia limited liability company.  Meyn LLC is a wholly-owned

subsidiary of Meyn Beheer BV, a company that is incorporated and has its principal

place of business in the Netherlands.  Meyn Beheer BV is owned by yet another Dutch

company, Meyn Holdings BV, which also is incorporated and has its principal place of

business in the Netherlands.  (Doc. 14, ¶¶ 19-20).  The Plaintiff, like the other Meyn

companies, manufactures, sells, and services poultry processing machines and parts.

(Doc. 14, ¶¶ 11, 21).

Tarheel Distributors Inc. is a North Carolina corporation with its principal place of

business in Sanford, North Carolina.  (Doc. 14, ¶ 12).  The company was founded in

1991 and specializes in aftermarket replacement parts for manufacturing industries.

Although it initially targeted the textile industry, in recent years it has turned its focus to

poultry processors.  (Doc. 14, ¶ 13).  Zajac is the president of Tarheel and is its primary

decision maker.  He is a Raleigh, North Carolina resident.  (Doc. 11, ¶ 1; Doc. 14, ¶¶

15-16).  He does not personally transact business in Georgia, nor does he own or

possess personal or real property in Georgia.  (Doc. 11, ¶¶ 5-7).  His only travel to

Georgia since 2008 has consisted of "a few connecting flights" at the Hartsfield-Jackson

Atlanta International Airport and one day at a poultry trade show.  Otherwise, he has not

traveled to Georgia for purposes of marketing or selling Tarheel's replacement parts.

(Doc. 11, ¶ 4).

## B. Background Events

In June 2006, Meyn Holding BV purchased Systemate Group, BV, a company

that also made and sold poultry processing machines and parts.  (Doc. 14, ¶ 23).

Systemate owned Dapec Inc., and on the date it was purchased, Systemate sold all of

Dapec's stock to Meyn Beheer BV, which in turn passed the stock to Meyn LLC, the

sole owner of the Plaintiff.  (Doc. 14, ¶ 24).  In October 2006, Dapec was merged into

the Plaintiff so that the Plaintiff was the only surviving entity.  At that point, the Plaintiff

owned all of Dapec's assets, which included a number of drawings for machine parts as

well as drawings indicating how the parts fit together into machines.  The drawings had

Systemate's name on them.  (Doc. 14, ¶¶ 25, 26).

In 2008, the Plaintiff began to "adapt" the Systemate drawings for Dapec

machines and parts.  A former Dapec employee, Doug Lee, who had become an

employee of the Plaintiff after the merger, worked on the project.  (Doc. 14, ¶¶ 28-29).

Lee's work gave him access to the drawings, which provide the blueprint the Plaintiff

uses to make the parts and machines it sells to customers.  (Doc. 14, ¶¶ 4, 29).  The

Plaintiff took steps to ensure the drawings remained confidential by storing them on a

password-protected computer system.  (Doc. 14, ¶ 33).  If the drawings had to be

disclosed, the Plaintiff deleted certain information so they could not be used to make the

depicted part.  In other circumstances, the Plaintiff required the recipient to sign a

nondisclosure agreement.  (Doc. 14, ¶ 34).  The Plaintiff did not sell the drawings or

make them available as a collection to third parties.  (Doc. 14, ¶ 35).  In the hands of a

third party, the drawings would enable a competitor to undercut the Plaintiff by selling

the parts at a lower price because the competitor would not incur research and

development expenses associated with designing and testing the parts.  (Doc. 14, ¶

37).

In 2009, as the project to adapt the drawings was ending, the Plaintiff fired Lee.

(Doc. 14, ¶ 31; Doc. 12, ¶ 5).  Before leaving his job, Lee signed an agreement in which

he promised he had returned all of the Plaintiff's confidential information or other

property.  (Doc. 14, ¶ 32; Doc. 1-1).  He further promised he would not personally or on

behalf of another company use or disclose "any trade secrets, confidential or competitive business information [he] may have acquired during [his] relationship with [the Plaintiff]." (Doc. 1-1 at 3). Lee then began looking for work elsewhere in the industry and discovered Tarheel. (Doc. 12, ¶ 5).

At that time, Tarheel's aftermarket replacement parts business model involved obtaining sample parts from end-users. Tarheel then sent the part to a Taiwanese company, O E Co., Ltd., which would try to reverse engineer it. If successfully reverse engineered, Tarheel could then make and sell the part for replacement in Dapec equipment. In 2009, Tarheel offered some 60 Dapec replacement parts. (Doc. 14, ¶¶ 5-6, 40).

After speaking by phone with Zajac, Lee traveled to North Carolina in August 2009 for two in-person interviews. (Doc. 12, ¶ 5). While interviewing, Zajac asked Lee whether he had entered into any agreements with the Plaintiff that would restrict his employment with Tarheel. Lee said he had not. Nor during the interview, according to Lee and Zajac, did they discuss the drawings.[1] (Doc. 11, ¶ 9; Doc. 12, ¶ 6). However, after he was hired and started working at Tarheel, Lee showed Zajac some of the drawings. Both men assert that Lee told Zajac the drawings were not a trade secret or in any way confidential. (Doc. 11, ¶ 10; Doc. 12, ¶ 7). Lee says he believed this to be true. (Doc. 12, ¶ 7). Lee also met with the principal of O E Co., Webster Huang. Following this meeting, which also included Zajac, Zajac informed Tarheel employees that Lee had brought with him the drawings for every Dapec part. (Doc. 14, ¶ 42).

---

[1] The Defendants inject these facts and others through affidavits by Lee and Zajac. Although the Court considers this evidence on Zajac's motion to dismiss for lack of personal jurisdiction, the Court does not treat these affidavits as evidence supporting the Defendants' motion to dismiss for failure to state a claim.

Zajac later told employees and contractors that Tarheel was now able to make any Dapec replacement part because of the drawings it had acquired from Lee, and that Tarheel was going to "make a lot of money" off the drawings.  (Doc. 14, ¶ 43).

In the years that followed, Lee sent emails to Huang attaching the Plaintiff's drawings so that Huang could manufacture the depicted parts without having to reverse engineer them.  Zajac was routinely copied on the emails. (Doc. 14, ¶ 44).  Sometimes Lee sent the drawings to Huang immediately after a Tarheel salesperson had let him know a customer needed the replacement part.  (Doc. 14, ¶ 45).  Meanwhile, the frequency of Tarheel's reverse engineering requests to Huang declined.  (Doc. 14, ¶ 46).

By 2013, Tarheel was offering nearly 560 Dapec replacement parts, an increase presumably due to its ability to make the parts based on the drawings rather than an expensive, time-consuming reverse engineering process.  (Doc. 14, ¶ 46-47, 49).  The Plaintiff contends it has been substantially damaged – to the tune of $5 million – because the sales of the Plaintiff's Dapec parts have dropped significantly since Lee took the drawings to Tarheel.  (Doc. 14, ¶ 50).  The Plaintiff accuses Zajac and Tarheel of misappropriating trade secrets under the GTSA because they obtained the drawings from Lee even though they "knew or had reason to know that the [d]rawings were acquired and retained by Lee using improper means."  (Doc. 14, ¶ 53).  Alternatively, the Plaintiff alleges claims for common law unfair competition, unjust enrichment, tortious interference with economic relations, and conversion.  The Plaintiff seeks an accounting, injunctive relief, punitive damages, and attorney's fees.  (Doc. 14, ¶¶ 51-95).

## II.  DISCUSSION

The Defendants have moved to dismiss the complaint.  They contend the Court does not have personal jurisdiction over Zajac and that he cannot be held individually liable for his actions.  They further contend the allegations do not state an actionable GTSA claim against either him or Tarheel because they do not show "misappropriation." Finally, the Defendants argue that the Plaintiff's GTSA claim provides the Plaintiff with its exclusive remedy and preempts any common law claims.

### A.  Personal Jurisdiction over Zajac

#### 1.  Burden of Proof

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction."  *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (internal quotation marks omitted) (citation omitted).  "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'"  *Id.* (citation omitted).  "'Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff.'"  *Id.* (citation omitted).

#### 2.  *Diamond Crystal* Jurisdictional Analysis

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the

Fourteenth Amendment to the United States Constitution."  *Id.* at 1257-58 (internal

quotation marks omitted)(citation omitted).[2]  This two-step inquiry is necessary because

the long-arm statute does not provide jurisdiction to federal courts in Georgia that is

coextensive with procedural due process.  *Id.* at 1259.  Rather, the statute "imposes

independent obligations that a plaintiff must establish for the exercise of personal

jurisdiction that are distinct from the demands of procedural due process."  *Id.*  In short,

jurisdiction that might appear to be conferred by statute may be negated by due process

concerns, and vice versa.  *See id.* at 1261.

### a.  The Long-Arm Statute

The Plaintiff argues that the Court has jurisdiction over Zajac under subsection

(1) of the Georgia long-arm statute, which states:  "A court of this state may exercise

personal jurisdiction over any nonresident … in the same manner as if he…were a

resident of this state, if in person or through an agent, he ... [t]ransacts any business

within this state ... ."  O.C.G.A. § 9-10-91(1).  *Diamond Crystal* instructs federal courts to

---

[2] As the Defendants have observed, the Plaintiff completely disregarded *Diamond Crystal*, blending the long-arm statute and constitutional due process jurisdictional analysis and going so far as to assert the two tests are the same.  The Plaintiff's assertion is incorrect in that it does not follow Eleventh Circuit precedent.  Be that as it may, there is clearly tension between *Diamond Crystal* and Georgia courts' interpretation of the Georgia long-arm statute following *Innovative Clinical & Consulting Services, LLC v. First National Bank of Ames,* 279 Ga. 672, 620 S.E.2d 352 (2005).  According to *Diamond Crystal*, *Innovative Clinical* holds that O.C.G.A. § 9–10–91(1) is not coextensive with due process limitations and must be analyzed independently therefrom.  Yet Georgia courts do not appear to read *Innovative Clinical* the same way. *See, e.g., Ralls Corp. v. Huerfano River Wind*, *LLC*, 2014 WL 2916443, at *7 (N.D. Ga.)(observing that Georgia courts continue to incorporate the due-process inquiry into their three-part test for determining whether personal jurisdiction lies under subsection (1) of the long-arm statute); *Amerireach.com, LLC v. Walker,* 290 Ga. 261, 269, 719 S.E.2d 489, 494 (2011) (considering due process concerns in its long-arm statute assessment); *Vibratech, Inc. v. Frost,* 291 Ga. App. 133, 137, 661 S.E.2d 185, 188 (2008) (citing *Innovative Clinical* for the proposition that "the language of O.C.G.A. § 9–10–91(1) must be construed as reaching 'to the maximum extent permitted by procedural due process'").  Moreover, prior to *Diamond Crystal* at least one federal district court read *Innovative Clinical* to extend § 9–10–91(1) to the limits of the Due Process Clause. *See, e.g., Global Payments Direct, Inc. v. Am. Bank of Commerce,* 2006 WL 269967, at *2 n.2 (N.D. Ga.).

interpret Georgia's long-arm statute literally.  593 F.3d at 1264.  Georgia courts have said that as part of the traditional three-part test used to decide whether long-arm jurisdiction exists under subsection (1), courts must determine whether "the nonresident defendant has purposefully done some act or consummated some transaction in this state … ."[3]  *Amerireach.com, LLC v. Walker*, 290 Ga. 261, 269, 719 S.E.2d 489, 496 (2011) (quoting *Aero Toy Store, LLC v. Grieves*, 279 Ga. App. 515, 517-18, 631 S.E.2d 734, 737 (2006)).  Significantly, to transact business "a defendant need not physically enter the state" to subject himself to the long-arm statute.  *Diamond Crystal*, 593 F.3d at 1264.  And courts may further consider the nonresident's mail, telephone calls, and other intangible acts that occur while the defendant is outside of Georgia.  *Id.*  The question is whether, upon analysis of all the defendant's tangible and intangible conduct, "it can fairly be said that the nonresident [defendant] has transacted any business within Georgia."  *Id.*[4]

The Plaintiff asserts this Court has jurisdiction over Zajac based on his involvement in Tarheel's decisions to (1) hire Lee from Georgia; (2) accept and use trade secrets stolen by Lee from Georgia; and (3) sell and store in Georgia products derived from the Plaintiff's trade secrets.  (Doc. 14, ¶ 16).  That is, the Plaintiff argues

---

[3] The rest of the test states that jurisdiction exists "if the cause of action arises from or is connected with such act or transaction, and [ ] if the exercise of jurisdiction by the courts of this state does not offend traditional fairness and substantial justice."  *Aero Toy Store*, 279 Ga. App. at 517-18, 631 S.E.2d at 737.  *Diamond Crystal* interprets the first prong of the test as reflecting the requirement of subsection (1) of the long-arm statute and the second and third prongs as comprising the traditional due process inquiry.  593 F.3d at 1260 n.11.

[4] In *Diamond Crystal*, the court adopted a literal definition of the words in the statute, such that "any" means "to any extent" or "in any degree."  593 F.3d at 1264 n.18.  "'Transact' means 'to prosecute negotiations,' to 'carry on business,' 'to carry out,' or 'to carry on.'"  "'Business' means 'activity directed toward some end,' or 'a usually commercial or mercantile activity customarily engaged in as a means of livelihood,' or 'transactions, dealings, or intercourse of any nature.'"  *Id.*

that Tarheel's transactions should be attributed to Zajac for purposes of asserting

jurisdiction over him.  The Defendant responds that transactions by Tarheel are not

reasons to require Zajac to answer the suit in his individual capacity.

Georgia courts have rejected the so-called "fiduciary shield" doctrine, which

prohibits a court from exercising personal jurisdiction over a nonresident individual

based solely upon acts taken in his capacity as a corporate officer.  In *Amerireach.com*,

the Georgia Supreme Court held that the doctrine conflicts with the literal language of

subsection (1) of O.C.G.A. § 9-10-91.  290 Ga. at 266, 719 S.E.2d at 494.[5]  However,

"jurisdiction over a corporate employee or officer 'does not automatically follow from

jurisdiction over the corporation[.]' "  *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465

U.S. 770, 780 n.13 (1984)).  Zajac's contacts with Georgia should not be judged

according to the corporate Defendants' activities in this state but, rather, must be

assessed individually.  *Calder v. Jones,* 465 U.S. 783, 790 (1984).

The Court may exercise jurisdiction over Zajac if he was a "primary participant[ ]

in an alleged wrongdoing intentionally directed at a [Georgia] resident."  *Id.*  "It is

axiomatic that a corporation like [Tarheel] cannot act other than through its officers,

employees, and agents."  *United Techs. Corp. v. Mazer,* 556 F.3d 1260, 1271 (11th Cir.

2009) (citing *Palazzo v. Gulf Oil Corp.,* 764 F.2d 1381, 1385 (11th Cir.1985)).  While a

corporate officer is not personally liable for a corporation's acts solely because he

serves in that capacity, personal participation in a corporation's wrongful activities

subjects both the officer and the corporation to liability.  *Ga. Cash Am., Inc. v. Greene,*

318 Ga. App. 355, 367-68, 734 S.E.2d 67, 76 (2012).

---

[5] This Court is required to "interpret and apply Georgia's long-arm statute in the same way as would the Georgia Supreme Court." *Diamond Crystal,* 593 F.3d at 1258.

In this case, the Plaintiff alleges that as president of Tarheel, Zajac is the "primary decision-maker" for the company.  (Doc. 14, ¶ 16).  Zajac has not specifically rebutted this description and notes that "[a]ll of [his] work and involvement in the poultry processing replacement parts business is done through Tarheel."  (Doc. 11, ¶ 2).  More significantly, the Plaintiff alleges Zajac is a central actor in Tarheel's acquisition of the Plaintiff's drawings.  Aside from interviewing and hiring Lee, the Plaintiff outlines Zajac's participation as follows: Zajac engaged in a meeting with Lee and Huang shortly after hiring Lee, after which Zajac informed Tarheel employees that Lee had brought with him the drawings for every Dapec part; on subsequent occasions, Zajac informed Tarheel employees and contractors that Tarheel was able to manufacture any Dapec replacement part based on the drawings Lee provided, and that Tarheel was going to "make a lot of money" because of this; when Lee sent emails to Huang attaching drawings for manufacture, Zajac was routinely copied with the correspondence.  (Doc. 14, ¶¶ 42-44).  These are allegations that, construed in the Plaintiff's favor, reveal intentional participation in a scheme that goes beyond mere knowledge of Tarheel's activity.

Although Zajac has submitted affidavits challenging the Court's jurisdiction, the affidavits focus on his lack of contacts with Georgia.  They do not rebut the Plaintiff's accusations that he was a driving force behind Tarheel's alleged misappropriation of trade secrets from a Georgia company.[6]  As Georgia courts have observed, subsection

---

[6] Both Zajac and Lee do state in their affidavits that they did not believe the drawings to be confidential or trade secrets.  (Doc. 11, ¶ 10; Doc. 12, ¶ 7).  If this is in fact true, this could potentially absolve them of "misappropriation" under the GTSA, and to that extent, the jurisdictional question becomes entwined with the merits of the case.  But at this stage in the proceedings, their bare assertions on this point are insufficient evidence to preclude this Court from exercising jurisdiction over Zajac.

(1) of the long-arm statute has "no explicit legislative limiting conditions[,]" and courts must give "appropriate breadth" to the "transacting any business" language. *Amerireach.com,* 290 Ga. at 265-66, 719 S.E.2d at 493-94.  To meet the requirements under subsection (1), a nonresident defendant must purposefully do some act or consummate some transaction in the state.  In this case, the Plaintiff's unrebutted allegations, with all reasonable inferences construed in its favor, show Zajac has met these requirements.  He was a primary participant when Tarheel transacted business in Georgia by using drawings taken from a Georgia company to construct and sell Dapec parts in Georgia.  Therefore, the personal jurisdiction requirements of Georgia's long-arm statute are satisfied.

### b.  Due Process

For the Court to exercise jurisdiction over nonresident defendants, it is not enough that the long-arm statute is satisfied.  Personal jurisdiction must also adhere to the Due Process Clause of the Fourteenth Amendment.  "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"  *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 319 (1945)).  "The heart of this protection is fair warning – the Due Process Clause requires 'that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there.'"  *Diamond Crystal,* 593 F.3d at 1267 (quoting *Burger King,* 471 U.S. at 474).  "Therefore, states may exercise jurisdiction over only those who have established certain minimum contacts with [the forum] such that the maintenance of the suit does

not offend traditional notions of fair play and substantial justice." *Id.* (quoting

*Helicopteros Nacionales de Colombia S.A. v. Hall,* 466 U.S. 408, 414 (1984) (internal

quotation marks removed)).

At issue is whether Zajac is subject to specific personal jurisdiction.[7]  "[T]he fair

warning requirement is satisfied if the defendant has purposefully directed his activities

at residents of the forum ... and the litigation results from alleged injuries that arise out

of or relate to those activities."  *Diamond Crystal,* 593 F.3d at 1267 (internal quotation

marks omitted) (citation omitted).  "Put differently, the defendant must have

'purposefully availed' itself of the privilege of conducting activities – that is, purposefully

establishing contacts – in the forum state and there must be a sufficient nexus between

those contacts and the litigation."  *Id.*  Once the plaintiff makes this showing, "a

defendant must make a 'compelling case' that the exercise of jurisdiction would violate

traditional notions of fair play and substantial justice."  *Id.* (citations omitted).

Given the allegations that Zajac exercised substantial control over Tarheel

operations and was a primary participant in the harm it directed at a Georgia company,

he is subject to essentially the same minimum contacts analysis as Tarheel would be.

*See U.S. SEC v. Carrillo,* 115 F.3d 1540, 1548 (11th Cir. 1997); *Gregory v. Preferred*

*Fin. Solutions*, 2013 WL 5725991, at *7 (M.D. Ga.).  As indicated above, the Plaintiff's

specific allegations are that Zajac was a primary participant in Tarheel's scheme to

---

[7] Two types of personal jurisdiction exist: general and specific.  General jurisdiction arises from a defendant's contacts with the forum state that "are unrelated to the cause of action being litigated." *Consol. Dev. Corp. v. Sherritt, Inc.,* 216 F.3d 1286, 1292 (11th Cir. 2000).  General jurisdiction further requires continuous and systematic contacts between the defendant and the forum state. *Meier v. Sun Int'l Hotels, Ltd.,* 288 F.3d 1264, 1274 (11th Cir. 2002).  General jurisdiction does not exist here.  Zajac is a resident of North Carolina, he does not own property or have any accounts based in Georgia, and has only been present in Georgia to change planes in Atlanta or to attend a trade show.  Further, the Plaintiff has not alleged facts to suggest that general jurisdiction exists.  (Doc. 11, ¶¶ 4-7).

misappropriate the trade secrets of the Plaintiff, a Georgia company.  That this

deliberate targeting of a Georgia company may have originated in North Carolina does

not matter.  Moreover, the Plaintiff alleges that Tarheel stores and sells to customers in

Georgia parts designed from the drawings.  (Doc. 14, ¶ 14).  Thus, Zajac and Tarheel

purposefully availed themselves of the privilege of conducting activities in this state, and

this lawsuit arises from those activities, providing Zajac and Tarheel fair warning their

conduct would subject them to personal jurisdiction in Georgia.  Furthermore, exercising

this jurisdiction comports with traditional notions of fair play and substantial justice as

outlined by *Burger King's* "fairness factors."  *See* 471 U.S. at 477.

Consequently, personal jurisdiction over Zajac is proper under the Due Process

Clause of the Fourteenth Amendment just as it is proper under Georgia's long-arm

statute.  Zajac's motion to dismiss for lack of personal jurisdiction is **DENIED**.

### B.  Zajac's Individual Liability

Zajac argues he cannot be held individually liable for torts Tarheel committed.  In

Georgia, the general rule is that

> an officer of a corporation who takes part in the commission of a tort by
> the corporation is personally liable therefor, and an officer of a corporation
> who takes no part in the commission of a tort committed by the
> corporation is not personally liable unless he specifically directed the
> particular act to be done or participated or co-operated therein.

*Dempsey v. Se. Indus. Contracting Co.*, 309 Ga. App. 140, 144, 709 S.E.2d 320, 324

(2011).  Here, as discussed above, the complaint alleges Zajac's direct participation in a

scheme to use drawings taken from the Plaintiff to manufacture replacement Dapec

parts.  To the extent Tarheel engaged in this activity, and accepting the Plaintiff's facts

as true with all reasonable inferences construed in its favor, Zajac was a central figure

in that endeavor.  Under the facts alleged, it simply cannot be said that he did not take part in the acquisition and use of the Plaintiff's drawings.  Accordingly, Zajac's motion to dismiss claims against him as an individual is **DENIED**.

### C. Failure to State a Claim

#### 1. Standard

To avoid dismissal pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (internal quotation marks and citation omitted).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679.  "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002).  Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts. *Marshall Cnty. Bd. of Educ. v. Marshall Cnty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citation omitted).

As noted above, the Defendants have submitted affidavits from Zajac and Lee that the Court has considered in regard to Zajac's motion to dismiss for lack of personal jurisdiction.  However, the affidavits are not appropriate support for the Defendants'

motion to dismiss for failure to state a claim, where the Plaintiff's well-pleaded

allegations are accepted as true.  *See Fuller v. SunTrust Banks, Inc.*, 744 F.3d 685,

695-96 (11th Cir. 2014) (recognizing that courts do not consider anything beyond the

face of the complaint and documents attached thereto when analyzing a motion to

dismiss under Fed. R. Civ. P. 12(b)(6)).  Even if the Court accepted the claims made in

the affidavits, that would merely create a factual dispute.

### 2.  Analysis

#### a.  Alleging "Misappropriation"

To obtain relief under the Act, the Plaintiff must allege both that the drawings are

a "trade secret" as defined by the Act and that the Defendants "misappropriated" that

trade secret.  *Wachovia Ins. Servs., Inc., v. Fallon*, 299 Ga. App. 440, 445, 682 S.E.2d

657, 662 (2009).  The Defendants do not argue the drawings are not "trade secrets" but

contend the Plaintiff has not alleged facts to show misappropriation.  Under the statute,

misappropriation means:

> (A) Acquisition of a trade secret of another by a person who knows or has
> reason to know that the trade secret was acquired by improper means; or
> (B) Disclosure or use of a trade secret of another without express or
> implied consent by a person who:
>> (i) Used improper means to acquire knowledge of a trade secret;
>> (ii) At the time of disclosure or use, knew or had reason to know that
>> knowledge of the trade secret was:
>>> (I)  Derived from or through a person who had utilized improper
>>>       means to acquire it;
>>> (II) Acquired under circumstances giving rise to a duty to maintain
>>>       its secrecy or limit its use; or
>>> (III)Derived from or through a person who owed a duty to the
>>>       person seeking relief to maintain its secrecy or limit its use; or
>> (iii) Before a material change of position, knew or had reason to know
>> that it was a trade secret and that knowledge of it had been acquired
>> by accident or mistake.

O.C.G.A. § 10-1-761(2).  The Defendants specifically insist the Plaintiff cannot satisfy the definition of "misappropriation" because the Plaintiff cannot establish that Lee acquired the drawings by "improper means."  Means that are improper include "theft, bribery, misrepresentation, breach or inducement of a breach of a confidential relationship or other duty to maintain secrecy or limit use…."  O.C.G.A. § 10-1-761(1).

For support, the Defendants rely on *Putters v. Rmax Operating, LLC*, 2014 WL 1466902 (N.D. Ga.).  Putters, a sales manager, resigned from Rmax, a company that made and sold building insulation materials.  During his 26 years of employment there, Putters had access to confidential information concerning Rmax's customers, pricing, and business strategy, and he had knowledge of Rmax's proprietary work on wall insulation.  Putters then went to work for an Rmax competitor.  After he resigned, Rmax discovered Putters had downloaded documents containing proprietary and confidential information to an external hard drive before turning in his computer and phone.  2014 WL 1466902, at *1.  The court determined that, even assuming Putters obtained the documents after his resignation, there was no misappropriation because Putters initially acquired the alleged trade secrets during his employment.  That is, he did not gain knowledge of any new trade secrets following his resignation.  Therefore, he did not acquire trade secrets using improper means.  2014 WL 1466902, at *3.

This case is not the same as *Putters*.  It is true that, as in *Putters*, the Plaintiff provided Lee access to the drawings while he was employed there.  The key distinction here is that when the Plaintiff fired Lee, Lee signed an agreement that he would not personally or on behalf of another company use or disclose "any trade secrets, confidential or competitive business information [he] may have acquired during [his]

relationship with [the Plaintiff]." (Doc. 1-1 at 3).  Significantly, "[a] non-disclosure agreement can be the basis for imposing a duty not to disclose a trade secret." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, --- F. Supp.2d ---, 2014 WL 1870734, at *8 (N.D. Ga.) (citing *Penalty Kick Mgmt. Ltd., v. Coca Cola Co.*, 318 F.3d 1284, 1292 (11th Cir. 2003)).  There was no such agreement in *Putters*.  And it is Lee's violation of this agreement that makes his acquisition of the Plaintiff's drawings "improper" despite the fact he had permission to use the drawings before he was fired; he breached a confidential relationship and duty to maintain the secrecy of the drawings.

Of course, Lee is not a defendant in this case even though he is the focus of the Defendants' argument on this point.  Not until their reply brief do the Defendants suggest *their own* acquisition of the drawings from Lee should be evaluated to determine whether it was improper.  And even then, the argument is made only by way of a cursory declaration that "hiring the former employee of a competitor is not improper means." (Doc. 18 at 7).  However, the facts support a claim for misappropriation at least on the grounds that the Defendants used improper means to acquire the drawings by inducing Lee to breach a confidential relationship or duty he owed the Plaintiff to maintain the drawings' secrecy.  *See* O.C.G.A. §§ 10-1-761(1), 10-1-761(2)(B)(i).  And at this stage of the proceedings, it could be inferred that if Zajac and Tarheel did not acquire the drawings improperly from Lee, it is plausible they knew or had reason to know that Lee acquired them improperly or that the drawings were trade secrets that had come into their possession by accident or mistake.

### b.  GTSA Preemption

The Defendants argue the GTSA preempts the Plaintiff's common law claims. They are correct.  The Act "supersede[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret."  O.C.G.A. § 10-1-767(a).  The Plaintiff protests that this preemption should not apply on a motion to dismiss because it has not yet been determined whether the drawings are in fact "trade secrets."  The Plaintiff's argument is not unreasonable and has been adopted by some courts outside of Georgia.

However, the Georgia Supreme Court has made clear that the breadth of the Act's preemption is such that even in the absence of a finding that the drawings are "trade secrets," there is no basis for alternative forms of relief.  "The fact that the drawings [are] not ultimately found to be trade secrets under the act [does] not make the preemption clause inapplicable.  Rather the key inquiry is whether the same factual allegations of misappropriation are being used to obtain relief outside the GTSA." *Robbins v. Supermarket Equip. Sales, LLC*, 290 Ga. 462, 466-67, 722 S.E.2d 55, 58 (2012); *see also Putters*, 2014 WL 1466902, at *2 (applying *Robbins* on a motion to dismiss and finding that the Act preempted the defendant's counterclaim for breach of fiduciary duty because it was based on essentially the same allegations as its GTSA counterclaim); *Diamond Power Int'l, Inc. v. Davidson*, 540 F. Supp. 2d 1322, 1345 (N.D. Ga. 2007) (finding plaintiff's common law claims superseded by the Act where plaintiff did not assert independent conduct beyond the facts supporting its GTSA claim); *Opteum Fin. Servs., LLC v. Spain*, 406 F.Supp 2d 1378, 1380 (N.D. Ga. 2005) (holding that courts can determine whether the Act supersedes a plaintiff's common law claims

even though the issue of whether the information qualifies as trade secrets under the

Act remains disputed and unresolved and concluding a plaintiff cannot plead an

alternative theory of recovery should the information ultimately not qualify as a trade

secret).  Although, as the Plaintiff observes, only *Putters* was decided on a motion to

dismiss, the thrust of these cases demonstrates that waiting to address the preemption

issue until the drawings' status as "trade secrets" is determined is futile.  "[A] plaintiff

cannot be allowed to plead a lesser and alternate theory of restitution simply because

the information does not qualify as a trade secret under the act."  *Robbins*, 290 Ga. at

465, 722 S.E.2d at 58.

Here, the Plaintiff does not contend its claims for unfair competition, unjust

enrichment, tortious interference with economic relations, and conversion, along with

the remedies it seeks in counts six through ten, are based on different factual

allegations than its claim under the GTSA.  Indeed, these are claims the Plaintiff has

pled in the alternative in case there is "a finding that the drawings are not entitled to

protection as trade secrets."  (Doc. 14, ¶¶ 58, 66, 70, 78).  Consequently, the Plaintiff's

non-GTSA claims are superseded and may be dismissed.[8]

### III. CONCLUSION

For the foregoing reasons, the Defendants' motion to dismiss (Doc. 15) Zajac for

lack of personal jurisdiction or lack of individual liability is **DENIED**, and the Defendants'

motion to dismiss the Plaintiff's GTSA claim is also **DENIED**.  However, the Plaintiff's

GTSA claim preempts its common law claims and remedies sought in counts two

---

[8] Therefore, the Court does not address the Defendants' argument that the Plaintiff's claim for
conversion independently fails as a matter of law.

through nine.[9]  To that extent, the Defendants' motion is **GRANTED**, and those claims

are **dismissed without prejudice**.

        **SO ORDERED,** this 4th day of August, 2014.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT

---

[9] This does not preclude the Plaintiff from seeking injunctive relief, damages, or attorney's fees under the GTSA as provided by O.C.G.A. §§ 10-1-762, 10-1-763, and 10-1-764.