IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

MEYN AMERICA, LLC,                      )
                                        )
    Plaintiff/Counter-Defendant,        )
                                        )
    v.                                  )    CIVIL ACTION NO. 5:14-CV-41(MTT)
                                        )
TARHEEL DISTRIBUTORS, INC., and         )
JOSEPH P. ZAJAC,                        )
                                        )
    Defendants/Counter-Claimants,       )
                                        )
    v.                                  )
                                        )
DONALD ANDREW MCCOY, JR.,               )
BLUEBEAK DISTRIBUTORS INC., and         )
LTA DISTRIBUTING, LLC,                  )
                                        )
    Counter-Defendants.                 )
_____ )

## ORDER

    Plaintiff Meyn America, LLC brought this action against Defendant Tarheel

Distributors, Inc. and its president, Defendant Joseph P. Zajac, based on the

Defendants' alleged acquisition of drawings Meyn uses to manufacture parts for poultry

processing machines.  According to Meyn, the acquisition and use of these drawings

allowed the Defendants to make parts without engaging in an expensive,

time-consuming reverse engineering process.  (Doc. 19 at 5)  The Court previously

denied the Defendants' motion to dismiss Meyn's claim that the Defendants

misappropriated trade secrets in violation of the Georgia Trade Secrets Act of 1990,

O.C.G.A. §§ 10-1-760 *et seq.*  (Doc. 19).

    After discovery commenced, the Defendants filed an amended answer and

counterclaim against Meyn and Counter-Defendants Donald Andrew McCoy, Jr.,

Bluebeak Distributors, Inc., and LTA Distributing, LLC for defamation, trade libel, and violations of the trade practices acts of North Carolina, Georgia, and Delaware.[1]  (Doc. 44).  The Defendants contend that once Tarheel started competing with Meyn, Meyn and the Counter-Defendants began disparaging Tarheel's parts and services.  Meyn and the Counter-Defendants have moved to dismiss the counterclaim pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim, and the Counter-Defendants have also moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(2) for lack of personal jurisdiction. (Docs. 51; 55).  For the following reasons, Meyn's motion (Doc. 51) is **GRANTED in part** and **DENIED in part**, and the Counter-Defendants' motion (Doc. 55) is **GRANTED.**

## I.      BACKGROUND

The following facts are taken from the allegations in the Defendants' amended answer and counterclaim and accepted as true for purposes of the Rule 12(b)(6) motions.

Meyn makes poultry processing equipment.  Before Tarheel entered the market for replacement poultry parts, "Meyn enjoyed a virtual monopoly over the market for replacement parts for its machines."  (Doc. 44 at ¶ 60).  This caused poultry producers to suffer "high prices and long wait times to fill orders."  (Doc. 44 at ¶ 60).  Seeing an opportunity, Tarheel began offering high quality replacement poultry parts at low prices and began investing in building relationships with its customers, its reputation in the poultry processing market, its website, its attendance at trade shows, and its distribution of marketing materials under its brand.  (Doc. 44 at ¶¶ 60, 73-74).  Now, Tarheel's parts are known in the poultry industry for their quality, craftsmanship, and dependability.

---

[1] McCoy is a citizen of and maintains his personal residence in Delaware.  (Doc. 44 at ¶ 68).  He is the President and sole corporate officer of Bluebeak, a West Virginia corporation with a principal place of business in Seaford, Delaware.  (Doc. 44 at ¶ 69).  McCoy is the sole member of LTA, a Delaware limited liability company with its principal place of business in Millsboro, Delaware.  (Doc. 44 at ¶ 70).

(Doc. 44 at ¶ 74).  Tarheel can fill many of its orders though next-day delivery, and the Defendants contrast this with Meyn, which often takes up to twelve weeks to fill an order. (Doc. 44 at ¶ 76).

One aspect of Tarheel's business involves modifying existing Meyn parts for its customers.  (Doc. 44 at ¶ 75).  Tarheel can meet with a customer about improving a part and then turnaround a working prototype within one to two weeks.  It may take Meyn months to do the same.  (Doc. 44 at ¶ 77).  Tarheel's modified parts last longer and are more dependable than Meyn's replacement parts.  (Doc. 44 at ¶ 75).  Meyn has received reports about the "quality and superior performance" of Tarheel's parts and knows that many perform better than its own.  (Doc. 44 at ¶¶ 78-81).  For example, Tarheel sells a modified version of a shackle from which chickens hang while they are processed, and Meyn learned from one of Tarheel's customers that Tarheel's "shackle has more clearance in/over equipment and does not hang up as easy as [Meyn's]."  (Doc. 44 at ¶ 78).  Similarly, Tarheel modified a stainless steel motor for one of its customers, and the customer told Meyn that it was "only getting 5 to 21 days life from [Meyn's] motors and that they have been using the motor from [Tarheel] for 6 to 7 months."  (Doc. 44 at ¶ 79).

Rather than meet Tarheel competitively, the Defendants allege that Meyn responded with a "multi-faceted attack on Tarheel."  (Doc. 44 at ¶¶ 61, 96).  The Defendants divide this attack into two components: (1) the campaign launched by Meyn employees and (2) the campaign launched by McCoy, Bluebeak, and LTA.  (Doc. 44 at ¶¶ 82-95, 96-104).

### A. Meyn's Campaign

The Defendants make the following allegations to support their claim that Meyn launched an unfair and deceptive campaign against Tarheel:

- Despite knowing about the quality and durability of Tarheel's parts, Meyn management in Georgia repeatedly referred to Tarheel parts as cheap and poor quality and Meyn service and sales staff reiterated this view in their dealing with and selling to poultry producers.  (Doc. 44 at ¶¶ 82-83).

- Meyn made false statements to at least two poultry producers by telling them that "their Meyn machines were not working because they had purchased and installed Tarheel parts."  (Doc. 44 at ¶ 89).

- To get its customers to purchase its new Big Bird Leg Processor, "Meyn told poultry plants that the previous version [was] obsolete and that there [were] no parts or service support for it," despite the fact that Tarheel continues to supply parts for and service it.  (Doc. 44 at ¶ 90).

- In March 2012, a Meyn employee disparaged Tarheel's parts in an attempt to justify its high prices to an Alabama poultry plant.  Specifically, the Meyn employee wrote: "when you compare what we quote to what is quoted by ... [Tarheel] it is not apples to apples"; "we supply hardened steel, in most cases [Tarheel] do[es] not, so the parts do not last anywhere near as long"; "If a 3rd party vendor [(like Tarheel)] sells a standard part for substantially less than we do, it is for a reason"; and "[Y]ou are losing quality."  These claims were false because "Tarheel's parts are made with durable, high-quality materials including hardened steel."  (Doc. 44 at ¶¶ 84-86).

- In April 2013, a different Meyn employee disparaged Tarheel's parts to a different Alabama poultry plant.  In promoting Meyn's V-Roller bearing, the Meyn employee told the plant that she wanted it to "get the best part ... to ensure proper performance" and that "the [Tarheel] V-Roller is a U.S. made piece and issnot [sic] the same German Quality as our bearing."  Thus, "by implication," the Meyn employee said Tarheel's part would not perform as well as Meyn's.  Meyn's claim that its bearing is better quality than Tarheel's was false, and because Meyn's bearing is made in China, not Germany, "Meyn's representation concerning the geographic source of its own bearing was also false."  (Doc. 44 at ¶¶ 87-88).

- Meyn falsely represented to one of Tarheel's customers that "Tarheel's service personnel were not qualified to work on Meyn machines.  This statement also implied that Meyn's service department is superior to Tarheel['s]."  However, "Tarheel's service personnel are qualified," and "Tarheel employs former Meyn service personnel with years of experience servicing Meyn equipment."  Several poultry producers have turned to Tarheel's service department to fix defective, substandard work performed by Meyn's service department.  (Doc. 44 at ¶¶ 92-93).

- In April 2009, a Meyn employee made misleading statements about the availability of Tarheel's service department to a Georgia poultry plant. Specifically, the Meyn employee wrote that competitors like Tarheel "do

not offer service and help desk services to try to support you 24-7-365." Contrary to this representation, "Tarheel's service professionals stand ready to serve their customers whenever and wherever they are needed." Moreover, Meyn's 24-7-365 claim is false because its service department is slow to respond to needs.  (Doc. 44 at ¶ 94).

## B.  McCoy, Bluebeak, and LTA's Campaign

According to the Defendants, McCoy is "a disgruntled, former Tarheel independent sales agent" who has "a vendetta against Tarheel and Zajac."  (Doc. 44 at ¶ 62).  In 2005, McCoy began working through Bluebeak "as an independent salesman of Tarheel parts."  (Doc. 44 at ¶ 97).  "Tarheel gave McCoy access to Tarheel business plans and pricing strategies[,] … allowed McCoy to advise it on which poultry parts it should add to its parts inventory[,] … trusted McCoy with its business matters[,] and looked forward to growing its relationship with McCoy."  (Doc. 44 at ¶ 98).  "In October 2013, McCoy announced he was leaving Tarheel to build his own parts business to compete with Tarheel."  (Doc. 44 at ¶ 99).  "The parting was not pleasant[,]" and "McCoy aired his animus toward Zajac when he gave Tarheel's President word of his departure."  (Doc. 44 at ¶ 99).  McCoy then went to work as a "Meyn sales agent" or "sales representative of Meyn's replacement parts."  (Doc. 44 at ¶¶ 62, 100).

The Counter-Defendants' campaign against the Defendants primarily consists of two components.  First, the Defendants allege that McCoy made actionable statements in May 2015 in Delaware.  (Doc. 44 at ¶¶ 101-107).  Specifically, McCoy visited Mountaineer Farms, which is a customer of Tarheel, "by and through [Bluebeak] and LTA" and "[a]s a Meyn sales representative."  (Doc. 44 at ¶¶ 101-102).  McCoy "met with a Mountaineer purchasing manager"; "boasted of his close connection with Meyn"; and "verbally attacked" Zajac and Preston and Rick Long, who are both Tarheel sales representatives.  (Doc. 44 at ¶¶ 101, 103).  McCoy "told Mountaineer that Zajac and the

Longs are dishonest and untrustworthy men" and "advised the purchasing manager that Mountaineer should not do business with them and, by extension, Tarheel." (Doc. 44 at ¶ 104). McCoy also "told the Mountaineer purchasing manager that this litigation was going to cause Tarheel to go out of business, leaving Mountaineer without a supplier for replacement parts." (Doc. 44 at ¶ 106). Thus, "[b]y implication, McCoy offered himself, [Bluebeak], LTA, and ultimately Meyn to stand in the gap this litigation might create in Mountaineer's supply chain." (Doc. 44 at ¶ 106). When Preston Long visited Mountaineer Farms shortly after McCoy's visit, the purchasing manager asked "if it was true that Tarheel was going out of business," and "Long assured Mountaineer that Tarheel is not going out of business." (Doc. 44 at ¶ 107).

Apart from the May 2015 visit, the Counter-Defendants allegedly have used Meyn's lawsuit "as a competitive weapon against Tarheel." (Doc. 44 at ¶ 105). The Defendants allege that McCoy was the source of a defamatory allegation Meyn made in its initial complaint: "[Tarheel and Zajac] hired Lee with the intention of Lee bringing the Drawings with him in violation of Lee's agreement with Meyn." (Docs. 1 at ¶ 78; 44 at ¶¶ 65, 109). Shortly after Meyn filed its initial complaint, McCoy, on February 14, 2014, e-mailed information about this lawsuit, such as the case number and date of filing, from his Bluebeak e-mail address to twenty-six purchasing managers in the poultry industry. (Docs. 44 at ¶ 108; 44-1). Shortly after that, the Defendants served Meyn with notice that the allegation about the reason for Lee's hiring violated Fed. R. Civ. P. 11, and Meyn withdrew the allegation when it filed its amended complaint. (Docs. 14; 44-2; 44 at ¶¶ 109-110). The Defendants now claim that McCoy's e-mail was defamatory because it directed the purchasing managers to the filings in this case and thus to Meyn's original complaint, which included the defamatory allegation about why the Defendants hired

Lee. (Doc. 44 at ¶ 109). The Defendants also allege that "McCoy expanded on the e-mail in his conversations with those managers by making defamatory statements against Tarheel, Zajac, and Tarheel's sales force similar to the one he made to Mountaineer."[2] (Doc. 44 at ¶ 108).

According to the Defendants, "McCoy aims his malicious acts at Tarheel for the purpose of misappropriating its market and harming its business." (Doc. 44 at ¶ 62). At the same time, "McCoy is an active participant" in Meyn's campaign against Tarheel and "acts in concert with Meyn." (Doc. 44 at ¶¶ 62-63). McCoy's actions thus "enrich Meyn and serve its competitive purposes," "help open more poultry producers to Meyn's products and services," "close poultry plants to Tarheel's parts and services," and "divert[] sales from Tarheel." (Doc. 44 at ¶¶ 63, 112). The Defendants allege that in September 2014, a Meyn employee wrote, "[McCoy] has taken over $30,000 away from [Tarheel] since June 3, [2014]." (Doc. 44 at ¶ 112). The Defendants also allege that "Meyn has rewarded McCoy for bearing false witness." (Doc. 44 at ¶ 66). The Defendants rely on an August 2014 e-mail exchange between McCoy and Meyn regarding McCoy's pursuit of a bid for supplying a poultry shackle to a plant in Milford, Delaware. McCoy said, "Don't forget me" and "Tarheel is at $125" per shackle. (Doc. 44 at ¶ 66). Meyn responded ten minutes later, "Will $100 work?" and "That's about our cost." (Doc. 44 at ¶ 66). The Defendants allege that this "discount allowed McCoy to undercut Tarheel's price" and that "Meyn has rewarded McCoy by providing him discounts on other bids." (Doc. 44 at ¶ 66).

---

[2] The Defendants allege in a conclusory fashion that "McCoy by and through [Bluebeak] and LTA has made many other false and disparaging statements to other poultry plants in Tarheel's market." (Doc. 44 at ¶ 111). Such attacks "would have particular significance" where Tarheel has "no established relationship" because Tarheel "has no or limited ability to challenge any of McCoy's defamatory assertions." (Doc. 44 at ¶ 111). "These plants would be left with the impression that Tarheel, its President, and its sales force are dishonest and unscrupulous." (Doc. 44 at ¶ 111).

### C. Claims

In Counts I-III, Tarheel brings claims against Meyn and the Counter-Defendants for violations of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. GEN. STAT. § 75-1.1; the Georgia Uniform Unfair and Deceptive Trade Practices Act, O.C.G.A. §§ 10-1-370 to -375; and the Delaware Uniform Deceptive Trade Practices Act, DEL. CODE ANN. tit. 6, § 2532.  These claims are based on (1) Meyn's misrepresentations concerning the quality and nature of its and Tarheel's products and services and (2) McCoy's statements that Zajac and the Longs are dishonest and untrustworthy, that Tarheel hired Lee to gain access to the drawings, and that Tarheel is going out of business due to this litigation.  (Doc. 44 at ¶¶ 113-130).  In Counts IV and V, Tarheel and Zajac bring claims against Meyn and the Counter-Defendants for defamation and trade libel based on McCoy's statements that Zajac is dishonest and untrustworthy and that Tarheel and Zajac hired Lee to gain access to the drawings.  (Doc. 44 at ¶¶ 131-146). The Defendants argue that Meyn can be held accountable for the actions of McCoy because (1) McCoy and Meyn acted in concert to harm Tarheel and (2) McCoy is Meyn's agent.  (Doc. 59 at 2).  The Defendants seek injunctive relief, treble damages, disgorgement of profits, attorney's fees, and punitive damages.  (Doc. 44 at 27).

## II.     DISCUSSION

The Counter-Defendants have moved to dismiss the counterclaim.  They contend that the Court does not have personal jurisdiction over them and that the Defendants have failed to state a claim.  Meyn has moved to dismiss on the grounds that the Defendants have failed to state a claim.

### A. Personal Jurisdiction over the Counter-Defendants

#### 1. Burden of Proof

"A plaintiff seeking the exercise of personal jurisdiction over a nonresident defendant bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *Diamond Crystal Brands, Inc. v. Food Movers Int'l, Inc.*, 593 F.3d 1249, 1257 (11th Cir. 2010) (citation omitted). "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction." *Id.* (internal quotation marks and citation omitted). "Where the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Id.* (citation omitted).

"A federal court sitting in diversity undertakes a two-step inquiry in determining whether personal jurisdiction exists: the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *Id.* at 1257-58 (citation omitted). This two-step inquiry is necessary because the long-arm statute does not provide jurisdiction to federal courts in Georgia that is coextensive with procedural due process. *Id.* at 1259. Rather, the statute "imposes independent obligations that a plaintiff must establish for the exercise of personal jurisdiction that are distinct from the demands of procedural due process." *Id.* In short, jurisdiction that might appear to be conferred by statute may be negated by due process concerns, and vice versa. *See id.* at 1261.

### 2.  Analysis

The Counter-Defendants contend this Court lacks personal jurisdiction over them because (1) McCoy is not subject to jurisdiction under Georgia's long-arm statute and (2) jurisdiction over McCoy, Bluebeak, and LTA would violate the Due Process Clause of the Fourteenth Amendment because there is not a sufficient nexus between any of their contacts with Georgia and this litigation.  In support of their motion, the Counter-Defendants submitted the declaration of McCoy, who explains the extent of the Counter-Defendants' contacts with the State of Georgia.  (Doc. 55-1).

McCoy says he does not conduct any business or own any real property in Georgia.  (Doc. 55-1 at ¶ 4).  He sent the February 14 e-mail from his Bluebeak e-mail account when he was physically located in Delaware, and none of the recipients of the e-mail are located in Georgia.  (Doc. 55-1 at ¶¶ 25-26).  McCoy has never had an employment relationship with Meyn or any other Georgia company, and neither have Bluebeak and LTA.  (Doc. 55-1 at ¶ 22).  Both Bluebeak and LTA compete with Tarheel and Meyn.  (Doc. 55-1 at ¶ 22).  Bluebeak started buying replacement parts from Meyn in June 2014, but its relationship with Meyn is purely as a purchaser.  (Doc. 55-1 at ¶¶ 16, 23).  "If Bluebeak needs a Meyn part for a customer, it sends a price request[,] negotiates individual deals per order[, and] … then controls the price of the product to the ultimate customer."  (Doc. 55-1 at ¶ 23).  Bluebeak has never sold products in Georgia nor had an employee or agent travel to Georgia to "call on" a poultry plant.  (Doc. 55-1 at ¶ 17).  "Bluebeak's last contact with Georgia was when [McCoy] attended a poultry trade show in Atlanta, Georgia in 2007," which was the last time McCoy was physically present in Georgia.  (Doc. 55-1 at ¶ 17).  Finally, LTA does minimal business in Georgia: it sells parts to a distributor based in Georgia and has sent parts to five

Georgia locations of Pilgrim's Pride pursuant to a contract negotiated with Pilgrim's Pride in Denver, Colorado. (Doc. 55-1 at ¶ 20).

In response, the Defendants produced evidence purporting to link McCoy's actions to harm the Defendants suffered in Georgia. The Defendants filed the declaration of Tara Warwick, who identifies the position and company of the recipients of the February 14 e-mail.[3] (Doc. 66). For example, Warwick testifies that one of the recipients, Shari Bowman, holds the position of Procurement Manager for Pilgrim's Pride. (Doc. 66 at 2). Separate from Warwick's declaration and with no attempt at authentication, the Defendants filed screenshots from the website of Pilgrim's Pride as evidence of the company's size and its seven operations in Georgia. (Docs. 67-4; 67 at 6). Warwick also states that several recipients of the February 14 e-mail hold positions with Tyson Foods and Perdue Farms, and the Defendants argue that both of these companies have at least two Georgia locations. (Docs. 66; 67 at 6).

Finally, the Defendants filed an October 25, 2013 e-mail McCoy sent from his Bluebeak e-mail account to Stanley Buel, who appears to be a Meyn employee, as evidence that McCoy claimed the Defendants hired Lee to gain access to Meyn's drawings. (Docs. 67 at 2; 67-1). In discussing the circumstances of this e-mail, the Defendants rely on portions of McCoy's declaration. (Doc. 67 at 2). McCoy testified that shortly after Bluebeak's relationship with Tarheel ended, he "was speaking with a friend that worked at Meyn … when Tarheel and the concern about stolen drawings came up." (Doc. 55-1 at ¶ 12). According to McCoy, Meyn was purportedly investigating a trade secret suit against Tarheel due to the speed with which it was

---

[3] Warwick works for Coats & Bennett, PLLC, which represents the Defendants. (Doc. 66 at 1). The Counter-Defendants object to the use of Warwick's declaration on the grounds that she lacks personal knowledge of the facts, which she testifies she discovered "[u]sing internet resources." (Docs. 66 at 1; 77 at 3). The Counter-Defendants also object to the use of the screenshots from the website of Pilgrim's Pride on the grounds that they are neither undisputed nor authenticated. (Doc. 77 at 5-6).

allegedly reverse engineering Meyn parts.  (Doc. 55-1 at ¶ 13).  McCoy "knew exactly what Meyn was referencing" because Bluebeak had been copied on e-mails where Tarheel sent Meyn drawings to Tarheel's overseas manufacturer in Taiwan.  (Doc. 55-1 at ¶ 13).  McCoy testified that he "provided documentation to Meyn" regarding these communications, and the October 25 e-mail appears to be such documentation.  (Doc. 55-1 at ¶ 13).  In that e-mail, McCoy forwards Stanley Buel an e-mail Lee sent to Webster Huang, who appears to be Tarheel's overseas manufacturer.  (Docs. 14 at ¶¶ 6-7; 67-1).  Lee's e-mail attaches a drawing and says, "[P]lease review the attached drawing. … Please provide price and delivery."  (Doc. 67-1).  McCoy then writes to Stanley,

> Here is were [sic] I was working on a drum & thigh cutter and needed a part for it. Tarheel didn't have it at the time. You can see in the email that the drawing was sent to Joe's manufacture[r] (Webster) to make ASAP. There is no **hear say** about it. Doug [Lee] took all the second processing (flex line, fat puller, food service, D-100, everything) and leveraged these drawings to Joe [Zajac] (Mr. Tarheel) to get his job at Tarheel. End of story. It happened.

(Doc. 67-1).  The Defendants argue McCoy's statements are false, relying on Zajac and Lee's testimony that Zajac "had no knowledge of the Meyn documents at the time he hired Mr. Lee."  (Doc. 67 at 2).

Surprisingly, the Defendants do not discuss Georgia's long-arm statute, leaving the Court to guess what subsection they think confers jurisdiction over each Counter-Defendant.  In their brief, the Defendants claim that "McCoy specifically directed his libelous acts at Georgia" and that "McCoy directed libelous statements at individuals who operated in Georgia, knowing his statements would harm Tarheel's business in Georgia."  (Doc. 67 at 5).  The Court can only presume that the Defendants are attempting to establish jurisdiction under subsection (2), which permits jurisdiction

over a nonresident who "[c]ommits a tortious act or omission within [Georgia], except as to a cause of action for defamation of character arising from the act." O.C.G.A. § 9-10-91(2). However, "[t]he language of the statute is clear, unequivocal and unambiguous in mandating the exclusion of an action predicated on defamation." *Worthy v. Eller*, 265 Ga. App. 487, 488, 594 S.E.2d 699, 700 (2004) (citation omitted). Moreover, "[f]or purposes of personal jurisdiction under Georgia's long-arm statute, Georgia courts have ruled that—when a defendant uses the telephone or email to contact a Georgia resident—defendant's conduct occurs at the place where defendant speaks into the telephone or types and sends his email." *LABMD, Inc. v. Tiversa, Inc.*, 509 F. App'x 842, 844 (11th Cir. 2013) (citations omitted); *see also Huggins v. Boyd*, 304 Ga. App. 563, 697 S.E.2d 253 (2010). The Defendants do not dispute that McCoy has not been physically present in Georgia since 2007, and specifically, that McCoy sent the February 14 e-mail from Delaware.

The Defendants also claim that the Counter-Defendants do business with Meyn, a Georgia business. (Doc. 67 at 7). Subsection (1) would permit jurisdiction *if* the Defendants' claims arise out of the Counter-Defendants' "transact[ion] of any business within [Georgia]." *Diamond Crystal*, 593 F.3d at 1264 (alteration in original) (citing O.C.G.A. § 9-10-91(1)). But the Defendants' claims are not based on any such transactions; rather, they are based on (1) McCoy's statements during his meeting with Mountaineer in Delaware; (2) the February 14 e-mail McCoy sent from his Bluebeak e-mail account while in Delaware; and (3) McCoy's statements to Meyn, a Georgia-based company, regarding why Tarheel and Zajac hired Doug Lee. Because the Defendants have failed to show, or even allege, that their claims arise out of or are connected to the Counter-Defendants' business transactions in Georgia, the Court

cannot exercise personal jurisdiction under subsection (1) of Georgia's long-arm statute. *See Amerireach.com, LLC v. Walker*, 290 Ga. 261, 269, 719 S.E.2d 489, 496 (2011) ("[J]urisdiction exists on the basis of transacting business in this state if … the cause of action arises from or is connected with such act or transaction … ." (citation and internal quotation marks omitted)); *Henriquez v. El Pais Q'Hubocali.com*, 500 F. App'x 824, 828 (11th Cir. 2012).

Finally, subsection (3) permits jurisdiction over a nonresident who "[c]ommits a tortious injury in this state caused by an act or omission outside this state if the tort-feasor regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this state." O.C.G.A. § 9-10-91(3). McCoy's February 14 e-mail and his statements to Meyn regarding why Tarheel and Zajac hired Doug Lee are the only two acts that the Defendants allege caused tortious injury in Georgia. Because the Defendants do not allege that LTA was involved in either of these acts, subsection (3) does not permit jurisdiction over LTA.[4] The Defendants do not attempt to rebut McCoy's declaration that he does not conduct any business in Georgia, apart from citing to their allegation that McCoy received a discount from Meyn in August 2014. (Docs. 44 at ¶ 66; 67 at 8). Thus, the Defendants have not shown or even alleged that McCoy has engaged in the "regular," "persistent," or "substantial" contact with Georgia required by subsection (3). *Innovative Clinical & Consulting Servs., LLC v. First Nat'l Bank of Ames*, 279 Ga. 672, 676 n.4, 620 S.E.2d 352, 356 (2005).

---

[4] The Defendants "consent" to treating Bluebeak and LTA as a single entity in light of McCoy's testimony that LTA assumed Bluebeak's customer obligations on June 15, 2015. (Docs. 55-1 at ¶ 24; 67 at 7). The Counter-Defendants reply that the contacts of each entity must be assessed separately, and the Court agrees. *See Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Each defendant's contacts with the forum State must be assessed individually.").

Bluebeak, however, "start[ed] buying replacement parts from Meyn [in] June of 2014." (Doc. 55-1 at ¶ 16).  Neither party discusses whether these purchases are sufficient under subsection (3) nor whether it is significant that they occurred after the acts alleged to have caused tortious injury in Georgia.  The Counter-Defendants argue that even if Bluebeak's business transactions in Georgia subject it to jurisdiction under the long-arm statute, the Defendants have failed to show that the exercise of jurisdiction would adhere to the Due Process Clause of the Fourteenth Amendment.  (Doc. 77 at 4). The Court agrees.

"The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgments of a forum with which he has established no meaningful 'contacts, ties, or relations.'"  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 471-72 (1985) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945)).  "The heart of this protection is fair warning—the Due Process Clause requires 'that the defendant's conduct and connection with the forum State [be] such that he should reasonably anticipate being haled into court there.'"  *Diamond Crystal*, 593 F.3d at 1267 (alteration in original) (quoting *Burger King*, 471 U.S. at 474).  "In specific jurisdiction cases, the 'fair warning requirement is satisfied if the defendant has purposefully directed his activities at residents of the forum ... and the litigation results from alleged injuries that arise out of or relate to those activities.'" [5]  *Id.* (quoting *Burger King*, 471

---

[5] Two types of personal jurisdiction exist: general and specific.  "Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint."  *Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291 (11th Cir. 2000).  General or all-purpose jurisdiction "arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated."  *Id.* at 1292. General jurisdiction requires continuous and systematic contacts between the defendant and the forum state, and "only a limited set of affiliations with a forum will render a defendant amenable to all-purpose jurisdiction there."  *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014).  Georgia is not McCoy's domicile, and Bluebeak and LTA's connections with Georgia "are not so 'continuous and systematic' as to render [each] essentially at home there."  *Carmouche v. Tamborlee Mgmt., Inc.*, 789 F.3d 1201, 1202 (11th Cir. 2015) (internal quotation marks and citations omitted).

U.S. at 472-73).  "Put differently, the defendant must have 'purposefully availed' itself of the privilege of conducting activities—that is, purposefully establishing contacts—in the forum state and there must be a sufficient nexus between those contacts and the litigation."  *Id.*  Once the plaintiff makes this showing, "a defendant must make a 'compelling case' that the exercise of jurisdiction would violate traditional notions of fair play and substantial justice."  *Id.* (citations omitted).

"In *intentional* tort cases, there are two applicable tests for determining whether purposeful availment occurred."  *Louis Vuitton Malletier, S.A. v. Mosseri*, 736 F.3d 1339, 1356 (11th Cir. 2013).  Under the *Calder*[6] "effects test," courts consider whether the tort "(1) [was] intentional; (2) [was] aimed at the forum state; and (3) caused harm that the defendant should have anticipated would be suffered in the forum state."  *Id.* (quoting *Licciardello v. Lovelady*, 544 F.3d 1280, 1285-86 (11th Cir. 2008)).  Under the traditional purposeful availment analysis, courts

> assess the nonresident defendant's contacts with the forum state and ask whether those contacts: (1) are related to the plaintiff's cause of action; (2) involve some act by which the defendant purposefully availed himself of the privileges of doing business within the forum; and (3) are such that the defendant should reasonably anticipate being haled into court in the forum.

*Id.* at 1357.  "In judging minimum contacts, a court properly focuses on 'the relationship among the defendant, the forum, and the litigation.'"  *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984) (citation omitted).

The Counter-Defendants argue that the Court cannot exercise personal jurisdiction over Bluebeak because its business transactions in Georgia are unrelated to the Defendants' claims.  (Doc. 77 at 4-5)  The Defendants do not base their jurisdictional argument on Bluebeak's business transactions in Georgia or even argue

---

[6] *Calder v. Jones*, 456 U.S. 783 (1984).

that those transactions are related to their claims.  Rather, they argue the Due Process

Clause permits the exercise of jurisdiction over Bluebeak because McCoy aimed his

conduct at and caused harm in Georgia.  Specifically, the Defendants argue it was

foreseeable that McCoy's February 14 e-mail, which was sent from a Bluebeak e-mail

account in Delaware, would harm Tarheel's reputation and ability to sell to poultry plants

located in Georgia because the recipients of the e-mail, although not located in Georgia,

are responsible for purchasing replacement parts for Georgia plants.  (Doc. 67 at 4-6).

Relying on McCoy's October 25 e-mail, which was also sent from a Bluebeak e-mail

account, and McCoy's testimony that he knew Meyn was investigating a trade secret

suit against Tarheel, the Defendants further argue that Bluebeak should reasonably

anticipate being called to Georgia to answer for McCoy's statements about why Lee

was hired because it was probable that Meyn, a Georgia-based company, would file a

suit in Georgia based on those statements.  (Docs. 55-1 at ¶ 13; 67 at 5-7).  The

Defendants do not argue that McCoy's statements during his meeting with Mountaineer

in Delaware provide a basis for jurisdiction.

The Defendants have failed to show that McCoy aimed his February 14 e-mail at

Georgia.  The recipients of the e-mail are not located in Georgia, and the Defendants

are not Georgia residents.  The Defendants simply ask the Court to presume that

because some of the twenty-six recipients of the e-mail are involved in purchasing

decisions for companies with some Georgia locations, Bluebeak should have

anticipated that the e-mail would cause Tarheel, a North Carolina entity, to suffer harm

in Georgia.  This is not enough to establish that Bluebeak should have reasonably

anticipated being haled into court in Georgia.  Similarly, the Defendants have failed to

show that McCoy's allegedly defamatory statements to Meyn were expressly aimed or

targeted at Georgia.  The statements do not reference Georgia nor refer to the Georgia activities of the Defendants.  The victims of the statements, the Defendants, are not located in Georgia, nor do the Defendants specifically say whether the Meyn employees who received the statements are located in Georgia.  The Defendants argue that McCoy knew Meyn was located in Georgia.  (Doc. 67 at 5.)  But this alone does not establish that Georgia is the focal point of the tortious activity.  *See Revell v. Lidov*, 317 F.3d 467, 473-76 (5th Cir. 2002); *Remick v. Manfredy*, 238 F.3d 248, 259 (3d Cir. 2001); *Lovelady*, 544 F.3d at 1286 n.6 ("Under the effects test, acts expressly aimed by the defendant at an individual in the forum may result in personal jurisdiction over the defendant, but mere untargeted action or a fortuitous result will not."); *Calder*, 465 U.S. at 788-90.  Bluebeak could not have reasonably anticipated being haled into court in Georgia simply because McCoy made defamatory statements about a nonresident of Georgia to a Georgia-based company.  Therefore, the exercise of personal jurisdiction over Bluebeak would violate the Due Process Clause.

### 3.  Jurisdictional Discovery

In their response brief, the Defendants request that they be allowed to conduct jurisdictional discovery "on the issue of [Bluebeak and LTA]'s contacts with this district." (Doc. 67 at 8.)  The Court rejects their request for two reasons.  First, given the Defendants failure to even mention the Georgia long-arm statute, the Court will not attempt to divine how discovery might allow the Defendants to establish that jurisdiction is proper under the statute.  Second, the Defendants have failed to allege a prima facie case of personal jurisdiction.  *See Cent. States, Se. & Sw. Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 946-47 (7th Cir. 2000); *McCarthy v. Yamaha Motor Mfg. Corp.*, 994 F. Supp. 2d 1318, 1328 (N.D. Ga. 2014) ("The

McCarthys' failure to establish a prima facie case for personal jurisdiction and to provide examples of discovery requests they would propound means that they have essentially asked for a jurisdictional fishing expedition, and the Court is not required to allow such an expedition."); *cf. Butler v. Sukhoi Co.*, 579 F.3d 1307, 1313-14 (11th Cir. 2009) (holding district court abused its discretion in allowing subject matter jurisdictional discovery when plaintiff failed to allege prima facie case for subject matter jurisdiction pursuant to an exception to the Foreign Sovereign Immunities Act in complaint).

### B. Meyn's Motion to Dismiss

#### 1. Standard

To avoid dismissal pursuant to Fed. R. Civ. P. 12(b)(6), a complaint must contain sufficient factual matter to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1261 (11th Cir. 2006) (internal quotation marks and citation omitted). However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679. "[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal." *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002). Where there are dispositive issues of law, a court may dismiss a claim regardless of the alleged facts. *Marshall Cty. Bd. of Educ. v. Marshall Cty. Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993) (citation omitted).

### 2.  Analysis

#### a.  Counts IV and V

In Counts IV and V, the Defendants bring claims against Meyn for defamation and trade libel based on McCoy's February 14 e-mail and his statements in Delaware. (Docs. 44 at ¶¶ 131-146; 59 at 6-7).  Meyn argues Counts IV and V should be dismissed because it is not responsible for McCoy's conduct.  The Defendants acknowledge that McCoy is not a Meyn employee but argue that Meyn is nevertheless liable because McCoy and Meyn are "joint tortfeasors" and, alternatively, McCoy is Meyn's agent.  (Doc. 59 at 2-4).

The Defendants' joint tortfeasor theory is wholly without merit.  Under Georgia law, a tortfeasor is not responsible for the negligence of his joint tortfeasor.  Rather, joint tortfeasors whose separate acts of negligence combine to cause an indivisible injury can be held jointly liable for that injury.[7]  *See Gault v. Nat'l Union Fire Ins. Co.*, 208 Ga. App. 134, 136-37, 430 S.E.2d 63, 65-66 (1993).  The Defendants' brief mention of Section 876 of the Restatement (Second) of Torts suggests that they are not really advancing a joint tortfeasor theory but rather are attempting to argue that, as Section 876 provides, Meyn ordered or induced McCoy to act.  But yet they disavow any conspiracy-type theory.  (Doc. 67 at 20).  In any event, the Defendants do not allege any facts suggesting that Meyn and McCoy colluded or acted in concert to cause injury to the Defendants.  *See Madden v. Fulton Cty.*, 102 Ga. App. 19, 21-22, 115 S.E.2d 406, 409 (1960).

The Defendants also argue McCoy is Meyn's agent, relying on the allegations that Meyn authorized McCoy to sell its replacement parts; Meyn gives McCoy discounts;

---

[7] Of course, joint and several liability has largely been abolished in Georgia.  *See* O.C.G.A. § 51-12-33.

McCoy "boasted of his close connection with Meyn" to a Tarheel customer in Delaware; Meyn's allegations in this lawsuit are informed substantially by McCoy; and Meyn celebrated McCoy taking over $30,000 in sales away from Tarheel.  (Docs. 44 at ¶¶ 62, 66, 100, 103, 105, 112; 59 at 5-6).  "In Georgia, an agency relationship is created 'wherever one person, expressly or by implication, authorizes another to act for him or subsequently ratifies the acts of another in his behalf.'"[8]  *Satisfaction & Serv. Hous., Inc. v. SouthTrust Bank, Inc.*, 283 Ga. App. 711, 712-13, 642 S.E.2d 364, 365 (2007) (quoting O.C.G.A. § 10-6-1)).  "To prove actual agency, the purported principal must have assumed the right to control the method, manner, and time of the purported agent's work, as distinguished from the right merely to require certain definite results in conformity to the contract."  *Id.* at 713, 642 S.E.2d at 365 (internal quotation marks and footnote omitted).  Apparent agency, on the other hand, arises "when the statements or conduct of *the alleged principal* reasonably cause the third party to believe that the principal consents to have the act done on his behalf by the purported agent."  *Id.* at 713, 642 S.E.2d at 366 (internal quotation marks and footnote omitted).  The Defendants do not allege that Meyn assumed the right to control McCoy's work or held McCoy out as its agent.  Accordingly, the Defendants have failed to sufficiently allege that McCoy, by virtue of his position with Meyn, is an agent for purposes of imposing liability on Meyn for McCoy's conduct.

Because Meyn cannot be held responsible for McCoy's conduct, Counts IV and V are **DISMISSED**.

---

[8] Both parties assume Georgia law applies.

### b. Counts I-III

In Counts I-III, Tarheel brings claims against Meyn for violations of the North Carolina Unfair and Deceptive Trade Practices Act, the Georgia Uniform Unfair and Deceptive Trade Practices Act, and the Delaware Uniform Deceptive Trade Practices Act based on Meyn's misrepresentations concerning the quality and nature of its and Tarheel's products and services.  (Doc. 44 at ¶¶ 113-130).  Meyn argues Counts I-III should be dismissed because the alleged statements of its employees are not actionable, and even if they are, the claims under the North Carolina and Delaware Acts fail because the statements were made in Georgia to recipients in either Georgia or Alabama.  Tarheel responds that the North Carolina Act applies because of Georgia choice-of-law rules and that the Delaware Act applies because McCoy's statements in Delaware can be attributed to Meyn.  (Doc. 59 at 9-10).  As discussed above, Meyn cannot be held responsible for McCoy's conduct in Delaware.  Accordingly, Count III is **DISMISSED**.

Meyn and Tarheel both argue that the Court should apply Georgia choice-of-law rules to determine whether the North Carolina Act applies to Meyn's conduct.  (Docs. 59 at 9-10; 65 at 7-8).  *See Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 932 (11th Cir. 2013).  Meyn and Tarheel also agree that the Court should apply the rule of *lex loci delicti*, which "has served the resolution of conflict of laws issues in tort actions … for nearly 100 years."  *Dowis v. Mud Slingers, Inc.*, 279 Ga. 808, 811, 621 S.E.2d 413, 416 (2005).  Under this rule, "a tort action is governed by the substantive law of the state where the tort was committed."  *Id.* at 809, 621 S.E.2d at 414.  "[T]he place of wrong, the locus delicti, is the place where the injury sustained was suffered rather than the place where the act was committed, or, as it is sometimes more

generally put, it is the place where the last event necessary to make an actor liable for an alleged tort takes place." *Risdon Enters., Inc. v. Colemill Enters., Inc.*, 172 Ga. App. 902, 903, 324 S.E.2d 738, 740 (1984) (quoting 15A C.J.S. Conflict of Laws, § 12(2)(b), 459).

Tarheel, which does not appear to dispute that the Georgia Act applies to Meyn's conduct, argues the North Carolina Act applies under the rule of *lex loci delicti* because it suffered economic injury at its Sanford, North Carolina headquarters after each attack on its parts and services. (Doc. 59 at 9). Meyn argues the last events necessary to make it liable for deceptive trade practices—namely, customers receiving the allegedly false and deceptive statements and then making decisions to cancel or reduce business with Tarheel—both occurred in Georgia and Alabama. (Doc. 65 at 8). Meyn further argues that Tarheel has not pled specific allegations regarding the business it lost as a result of the statements made by Meyn employees. (Doc. 65 at 8 n.3).

Counts I and II are based on disparaging statements allegedly made by Meyn. (Doc. 44 at ¶¶ 113-125). The nature of the tort here is thus akin to defamation. *See Schutz Container Sys., Inc. v. Mauser Corp.*, 2012 WL 1073153, at *13 (N.D. Ga.) (collecting cases supporting the position that "causes of action arising under O.C.G.A. § 10-1-372(a)(8) are considered according to traditional defamation principles"). In actions for defamation, the place where the tort was committed is the place where the publication occurred. *See Triguero v. ABN AMRO Bank N.V.*, 273 Ga. App. 92, 95, 614 S.E.2d 209, 212 (2005) ("[T]he law of the jurisdiction where the publication occurs determines the rights and liabilities of the parties."). Because Meyn made the alleged statements to customers located in Georgia and Alabama, the Court finds that Georgia and Alabama are the places where the injury Tarheel sustained was suffered. Although

Tarheel contends it suffered injury in North Carolina, nothing in its counterclaim suggests that this is the case.  Tarheel simply asks the Court to assume it suffered injury in North Carolina because this is where it is headquartered.  The rule of *lex loci delicti* requires a more exacting analysis.  *See, e.g.*, *United Dominion Indus., Inc. v. Overhead Door Corp.*, 762 F. Supp. 126, 130 (W.D.N.C. 1991) ("Plaintiff's position would allow a corporation to conduct an entire transaction in a foreign jurisdiction and urge the law of the corporation's state of residency in subsequent litigation.").  Because the law of North Carolina does not apply to Tarheel's claims, Count I is **DISMISSED**.

Finally, Meyn argues that Count II should be dismissed because it is based on statements of opinion by Meyn personnel.  (Docs. 51 at 8-9; 65 at 6-7).  Tarheel argues the alleged statements violate at least O.C.G.A. § 10-1-372(a)(8).  (Docs. 44 at ¶ 125; 59 at 7-8).  Under O.C.G.A. § 10-1-372(a)(8), "[a] person engages in a deceptive trade practice when, in the course of his business, vocation, or occupation, he … [d]isparages the goods, services, or business of another by false or misleading representation of fact."  At this stage of the litigation, the Court cannot say as a matter of law that Meyn did not engage in a deceptive trade practice when it represented that Tarheel's parts do not last as long as Meyn's parts because Tarheel's parts do not contain hardened steel.  (Docs. 44 at ¶¶ 84, 85; 59 at 7).  Because Meyn does not contend that Tarheel has failed to allege it is likely to be damaged in the future, the Court will not consider whether Count II should be dismissed on that ground.  *See Tri-State Consumer Ins. Co. v. LexisNexis Risk Sols. Inc.*, 823 F. Supp. 2d 1306, 1326-27 (N.D. Ga. 2011); *Catrett v. Landmark Dodge, Inc.*, 253 Ga. App. 639, 644, 560 S.E.2d 101, 106 (2002).  Accordingly, Meyn's motion to dismiss Count II is **DENIED**.

Finally, at the conclusion of their brief in opposition to Meyn's motion to dismiss, the Defendants request leave to amend their counterclaim in the event the Court grants Meyn's motion.  (Doc. 59 at 12).  "Where a request for leave to file an amended complaint simply is imbedded within an opposition memorandum, the issue has not been raised properly."  *Rosenberg v. Gould*, 554 F.3d 962, 967 (11th Cir. 2009) (quoting *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir. 1999)).  Moreover, the Defendants have failed to comply with Federal Rule of Civil Procedure 7(b) by failing to attach a copy of their proposed amendment or set forth the substance of their proposed amendment.  *Id.*  Accordingly, the Defendants request for leave to amend is **DENIED**.

### III.     CONCLUSION

For the foregoing reasons, the Counter-Defendants' motion (Doc. 55) is **GRANTED**, and Meyn's motion (Doc. 51) is **GRANTED in part** and **DENIED in part**.

**SO ORDERED**, this the 22nd day of January, 2016.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT